IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| NATHANIEL HARPER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 12-CV-1188-NJR-DGW |
| ) | |
| VENERIO M. SANTOS and ) | |
| TERRI DEAN, ) | |
| ) | |
| Defendants. ) | |

# MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

On November 19, 2012, Plaintiff Nathaniel Harper filed a Complaint related to the medical care he received while incarcerated at the Centralia Correctional Center ("Centralia") beginning in December 2010. In particular, Plaintiff alleges that Defendants Santos and Dean (along with other medical providers) were deliberately indifferent to his medical needs as they related to a condition that necessitated surgery and significant post-surgical care. On January 17, 2013, Plaintiff's claims were screened pursuant to 28 U.S.C. § 1915A (Doc. 6), and he was permitted to proceed on one count of deliberate indifference to serious medical needs against Dr. Santos and Nurse Dean. Defendants moved for summary judgment on May 6, 2014 (Doc. 40). Plaintiff, through counsel, responded on February 9, 2015 (Doc. 72).

## FACTUAL BACKGROUND

All facts are construed in a light most favorable to Plaintiff. *Miller v. Gonzalez*, 761 F.3d 822, 826 (7th Cir. 2014). On December 3, 2010, Plaintiff presented at the Health

Care Unit ("HCU") with complaints of stomach pain (Nathaniel Harper Deposition pp. 18-19, 21-22 Doc. 40-2). He was seen by a nurse who diagnosed constipation; she told Plaintiff there was nothing that could be done and sent him back to his cell (Harper Dep. p. 22). On the morning of December 4, 2010, Plaintiff returned to the HCU. (Harper Dep. P. 18). Plaintiff was still experiencing vomiting and significant stomach pain and "couldn't deal with the pain" (Harper Dep. pp. 18, 22). He was once again returned to his cell with a diagnosis of constipation (*Id.*). Later that same day, Plaintiff returned to the HCU with "sharp abdominal pains" (Harper Dep. pp. 19-20). On December 5, 2010, Plaintiff again presented to the HCU. This time, however, he was seen by Dr. Santos and subsequently transported to the emergency room at St. Mary's Good Samaritan Hospital ("St. Mary's") to rule out a small bowel obstruction (Harper Dep. p. 23). Plaintiff testified that he was twice returned to his cell after complaining about abdominal pain and cramps (Harper Dep. p. 21).

At his deposition, Plaintiff testified that the nurse who returned him to his cell on December 3 and 4, 2010, was Defendant Dean:

> Q: [D]o you remember the names of any of the nurses who saw you before you went to the hospital, at the jail, or at the prison . . . ?
>
> A. Terri Dean, she turned around and seen me. She's the one that told me – her and this other nurse was the ones that turned around telling me this here, and she's the one that turned around and was orchestrating all of this, and telling me ain't nothing could happen or whatever.

(Harper Dep. p. 23).

Plaintiff also indicated that when he presented at the HCU with his condition, the nurses there (three of them), "kept laughing, telling me . . . it was just constipation,

and there's nothing they can do, and I had to wait it out" (Harper Dep. p. 18). Finally, Plaintiff testified that an x-ray was not taken of his abdomen before he was transported to St. Mary's.

Medical records reveal that when Plaintiff presented to the HCU on December 3, 2010, he was physically examined. The nurse, C. Podergois, indicated that he had generalized abdominal pain, bowel signs "present x4," vomiting, but no diarrhea (Doc. 72-2, p. 2). Plaintiff was not referred to the doctor. Instead, he was told to rest, avoid some over-the-counter medication, and return to the HCU if the symptoms persist (*Id.*). When Plaintiff returned the next morning, nausea and vomiting were noted, and a physical examination revealed mild pain upon palpation (Doc. 72-2, p. 4). Plaintiff was referred to Dr. Santos by Nurse C. Kracht (*Id.*).

There is no dispute that Dr. Santos issued a "telephone order to have Mr. Harper admitted to the Health Care Unit for Observation" (Venerio Santos Affidavit, ¶ 3, Doc. 40-3). It appears that Plaintiff was admitted to the HCU that morning as indicated in an "Offender Infirmary Progress Notes" signed by Nurse J. Wesselmann (Doc. 72-2, p. 6). Further infirmary progress notes for December 4, 2010, reveal that Plaintiff was checked at 3:05 p.m., and he continued to complain of cramping and abdominal pain (Doc. 72-2, p. 7). At 7:35 p.m., Plaintiff complained of "sharp pains," and at 11:00 p.m., Plaintiff apparently relayed that he had not eaten in two to three days and that his condition started three to four days ago (Doc. 72-2, p. 9). Dr. Santos examined Plaintiff on December 5, 2010, and ordered an x-ray of Plaintiff's abdomen (Santos Aff. ¶ 4). While there is some dispute as to whether an x-ray was taken and when Dr. Santos viewed the

x-ray, it is undisputed that at 10:05 a.m., Plaintiff was sent to St. Mary's in order to rule out a small bowel obstruction (Doc. 72-2, p. 11).[1]

While at St. Mary's, Plaintiff underwent a total of nine surgeries for a small bowel obstruction and complications from that surgery. The complications included "infections, pneumonia, peritonitis, and dehydration" (Santos Aff. ¶ 6). On January 12, 2011, Plaintiff returned to Centralia with a colostomy bag. In the St. Mary's "Discharge Summary," Plaintiff's medications included Tylenol 650 mg every six hours as needed and Vicodin 500mg/5mg every six hours for pain. (Doc. 72-2, pp. 15-16). Plaintiff was further advised to drink plenty of fluids, to continue activities as tolerated, and to have a regular diet with more oral fluids (Doc. 72-2, pp. 15-16).

In addition, while at St. Mary's, Plaintiff underwent a nephrology consultation after it was discovered that he had a "hypodense lesion in the left upper pole of the kidney" that was "suspicious for renal cell carcinoma" (Doc. 72-2, pp. 15-16). The Discharge Summary recommended that Plaintiff undergo a renal ultrasound every three months. The note further indicates: "However, patient will be followed by primary care physician, and he will decide about the renal mass" (*Id.*).

Upon Plaintiff's return to prison on January 12, 2011, he was housed in the HCU for observation. It is undisputed that Dr. Santos examined Plaintiff on thirty one separate occasions between January 13, 2011, and April 13, 2011 (Santos Aff. ¶ 12). While Nurse Dean disputes that she treated or even saw Plaintiff from December 3 through 5, 2010, she attests that she assessed him thirty times between January 12, 2011,

---

[1] An x-ray report reveals that it was viewed on December 5, 2010, by Dr. K. Wong and that a report was generated on December 7, 2010 (Doc. 40-8, p. 2).

and April 4, 2011 (Terri Dean Affidavit, ¶¶ 3-4, 11, Doc. 40-4). It is also undisputed that during that time period, nurses in the HCU checked on Plaintiff 358 times. Plaintiff testified that during this time period, his complaints of pain were ignored, he was not provided adequate nutrition, his IV line became clotted, he was "antagonized" by Nurse Dean, and Dr. Santos failed to adequately monitor his kidney issues.

*Pain Medication*

It is undisputed that Dr. Santos discontinued Plaintiff's Vicodin prescription on January 12, 2011, upon his return to Centralia (Doc. 40-14, p. 4)). But Plaintiff continued receiving Tylenol 650mg every six hours as needed. On January 13, 2011, Plaintiff's Tylenol was modified to a "500 mg 1-2 tab" every six hours as needed (*Id.*).[2] On January 26, 2011, Plaintiff's Tylenol prescription was modified to 500 mg 1-2 tabs as needed twice daily (*Id.*). On February 7, 2011, Plaintiff also was prescribed Indocin 500 mg three times a day as needed for pain for ten days (Doc. 40-7, p. 6). Tylenol was discontinued on February 9, 2011. Three days later, however, on February 12, 2011, it was re-prescribed at 650 mg every six hours as needed for five days (*Id.* pp. 7-8). Plaintiff's medical records reveal that Tylenol was prescribed at 1000 mg on that same day, at 5:30 p.m. (Doc. 40-14, p. 24). On February 21, 2011, Plaintiff was then prescribed Motrin 600 mg every four hours as needed for five days (*Id.* p. 9). The Motrin was discontinued on February 26, 2011, and Tylenol 500 mg every four hours as needed was prescribed (*Id.* p. 10).

---

[2] Dr. Santos stated that he prescribed Tylenol at 1000 mg on January 13, 2011--presumably two tabs of 500 mg Tylenol (Santos Aff. ¶ 8). Plaintiff does not dispute the records or evidence regarding his pain medication. In his statement of facts, Plaintiff only highlights the pain medication he received from January 11, 2011, to January 13, 2011, arguing that it was ineffective to combat his pain.

Plaintiff testified that "[f]or as long as I was up there [in HCU], I begged Dr. Santos, I begged him to turn around and do something about the pain that I was having and to do something about weight loss" (Harper Dep. p. 70). Plaintiff further states that the pain medication "weren't working at all" and that he just "wanted the pain to stop" (Harper Dep. p. 77). The medical records reveal that Plaintiff sought pain medication on January 12, 2011, January 13, 2011 (at 8:00 a.m.), January 23, 2011, February 21, 2011, and February 22, 2011 (Doc. 40-14). The records also reveal either no complaints or indications that Plaintiff was feeling better almost every single day while Plaintiff was in the HCU.

*Nutrition*

Plaintiff further testified that he complained to Dr. Santos about being "hungry all the time" (Harper Dep. p. 72). He accused Dr. Santos of letting him die. Plaintiff further stated that he could "feel [his] body leaving [his] spirit," but that Dr. Santos, upon hearing this, merely "threw his head up and walked out" (*Id.* p. 72-73). At one point, Plaintiff discovered that he could tolerate eggs. But when he asked to "just skip all the rest of this [food] stuff" and only receive eggs, Dr. Santos said no (Harper Dep. p. 72). Plaintiff admitted, however, that he had trouble holding down food after the surgery and that Dr. Santos changed his diet in order to alleviate the vomiting (Harper Dep. p. 73). Medical records indicate that Plaintiff complained of weakness and throwing up on January 14, 2011, and January 16, 2011, and he was noted as appearing thin and frail on this date (Doc. 40-14, pp. 6, 8). Plaintiff complained of starving on January 17, 2011; "fading away" on January 24, 2011; and "I don't think I'm going to

make it" on January 25, 2011 (*Id.* p. 9, 13, 14). As noted above, other entries indicate no complaints, some complaints of nausea and vomiting, and other indications that Plaintiff was tolerating various food well. The record further reveals that changes in Plaintiff's diet were made including a pureed diet, "fibersource" drinks, clear liquids, double trays, Ensure, and increased fluids.

*I.V. and Blood Clot*

It is undisputed that at some point in February, the I.V. site in Plaintiff's arm started to bleed (Harper Dep. p. 49). Nurse Dean checked the site, cleaned the area, stopped the bleeding, and re-taped the I.V. to prevent it from moving (Harper Dep. pp. 50-51). On February 12, 2011, Plaintiff complained that the site was hurting, and the I.V. was removed by another nurse (Doc. 40-14, p. 24). The area around the I.V. site showed "signs of phlebitis with tenderness to touch, heat, and swelling" (*Id.*). On February 14, 2011, Plaintiff was sent to St. Mary's to evaluate the I.V. site; he was diagnosed with a DVT/blood clot and treated. Plaintiff states that "St. Mary's Hospital" told him the clot was the result of a dirty syringe (Harper Dep. p. 51).

*Nurse Dean's Interactions with Plaintiff*

It is undisputed that Nurse Dean confiscated a pillow that Plaintiff used to elevate his leg in order to alleviate some pain from gout (Harper Dep. pp. 90-91). In addition, on one occasion, Plaintiff requested she empty his colostomy container; Nurse Dean refused and walked out of the room (Harper Dep. p. 91).

*Plaintiff's Kidney Condition*

As noted above, during Plaintiff's stay at St. Mary's, it was advised that he should receive an ultrasound of his kidney every three months. It is undisputed that an

ultrasound was conducted on April 6, 2011 (Santos Aff. ¶ 14), three months after Plaintiff's return to Centralia and just before colostomy reversal surgery. The report indicates: "Left upper pole solid approximately 8 cm size tumor suspicious for malignancy such as a renal cell carcinoma" (Doc. 40-10, p. 2). And it is undisputed that Dr. Santos monitored Plaintiff's kidney through blood and urine tests, which have all been negative. The tests, including BUN, Creatinine, and urinalysis were completed on May 9, 2011, October 23, 2011, October 30, 2012, and February 21, 2013 (Santos Aff. ¶ 16).

Plaintiff has "not shown any signs or symptoms of kidney disease such as abnormal lab values, blood in his urine, or flank pain" (Santos Aff. ¶ 17). At some point in 2012, Plaintiff attempted to discuss his kidney issue with Dr. Santos and asked when he would get an ultrasound, to which Dr. Santos "screamed 'Never!'" and "said he would not do anything because it was 'only' a cyst on [Plaintiff's] kidney" (Harper Aff. ¶ 4, Doc. 72-2, pp. 46-47).

## DISCUSSION

### A. Legal Standard for Summary Judgment

Summary judgment is proper only if the moving party can demonstrate Athat there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. FEDERAL RULE OF CIVIL PROCEDURE 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). *See also Ruffin-Thompkins v. Experian Information Solutions, Inc.*, 422 F.3d 603, 607 (7th Cir. 2005); *Black Agents & Brokers Agency, Inc. v. Near North Ins. Brokerage, Inc.*, 409 F.3d 833, 836 (7th Cir. 2005). The moving party bears the burden of establishing that no material facts are in genuine dispute; any doubt as to the existence

of a genuine issue must be resolved against the moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970). *See also Lawrence v. Kenosha County*, 391 F.3d 837, 841 (7th Cir. 2004).

A moving party is entitled to judgment as a matter of law where the non-moving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex,* 477 U.S. at 323. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* The Seventh Circuit has stated that summary judgment is "the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007) (quoting *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005) (other citations omitted)).

B. **Analysis**

Prison physicians are liable under the Eighth Amendment for cruel and unusual punishment if they are deliberately indifferent to an inmate's serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). In order to prevail on a deliberate indifference claim, there are "two high hurdles, which every inmate-plaintiff must clear." *Dunigan ex rel. Nyman v. Winnebago County*, 165 F.3d 587, 590 (7th Cir. 1999). First, the plaintiff must demonstrate that his medical condition was "objectively, sufficiently serious." *Greeno v. Daley*, 414 F.3d 645, 652-653 (7th Cir. 2005) (citations and quotation marks omitted). Second, the plaintiff must demonstrate that the "prison officials acted with a sufficiently culpable state of mind," meaning that the prison officials knew that the prisoner's

medical condition posed a serious risk to the prisoner's health, but they consciously disregarded that risk. *Greeno*, 414 F.3d at 653; *Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012).

1. **Serious Medical Need**

A serious medical condition is one "that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Edwards v. Snyder*, 478 F.3d 827, 830–31 (7th Cir. 2007). The following circumstances could constitute a serious medical need: "The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Hayes v. Snyder*, 546 F.3d 516, 522-23 (7th Cir. 2008) (quoting *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997)).

Defendants do not contest the first prong of the deliberate indifference analysis–that Plaintiff had a serious medical condition. Thus, the issue presented by the summary judgment motion is whether Defendants were deliberately indifferent to Plaintiff's serious medical condition.

2. **Deliberate Indifference**

A prisoner must show that prison officials acted with a sufficiently culpable state of mind, namely, deliberate indifference. "Deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain.'" *Estelle*, 429 U.S. at 104 (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). "The infliction of

suffering on prisoners can be found to violate the Eighth Amendment only if that infliction is either deliberate, or reckless in the criminal law sense." *Duckworth v. Franzen*, 780 F.2d 645, 652-53 (7th Cir. 1985). Negligence, gross negligence, or even "recklessness" as that term is used in tort cases, is not enough. *Id.* at 653; *Shockley v. Jones*, 823 F.2d 1068, 1072 (7th Cir. 1987). Put another way, the plaintiff must demonstrate that the officials were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and that the officials actually drew that inference. *Greeno*, 414 F.3d at 653. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . and a fact finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994) (citations omitted).

A plaintiff does not have to prove that his complaints of pain were "literally ignored," only that "the defendants' responses to it were so plainly inappropriate as to permit the inference that the defendants intentionally or recklessly disregarded his needs." *Hayes* 546 F.3d at 524 (quoting *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000)). "Even if the defendant recognizes the substantial risk, he is free from liability if he 'responded reasonably to the risk, even if the harm ultimately was not averted.'" *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010) (quoting *Farmer*, 511 U.S. at 843).

Plaintiff's concerns boil down to a simple claim: he underwent major surgery that necessarily resulted in pain and the inability to keep down food, and he wanted the pain relieved, he wanted to be able to eat without vomiting, and he wanted caring and

compassionate healthcare providers. While these are not unreasonable expectations, the evidence reveals that Defendants did not act with deliberate indifference to his serious medical needs. At most, Plaintiff may have shown that Defendants were negligent in attending to his needs and that they were not sympathetic to his dramatic statements of impending death. But Plaintiff has not shown that Defendants violated the United States Constitution in their care and treatment of his medical conditions.

### a. Dr. Venerio Santos

Plaintiff argues that Dr. Santos was deliberately indifferent because he failed to manage Plaintiff's pain, allowed him to starve, and failed to properly evaluate his kidney condition.

Although Plaintiff was prescribed Vicodin at St. Mary's, the prescription was discontinued by Dr. Santos in favor of increased milligrams of Tylenol. Dr. Santos stated that "[t]his amount of pain medication should be sufficient to help the patient but sometimes, healing simply takes time" (Santos Dep. ¶ 8). Plaintiff's entire argument revolves on the discontinuation of Vicodin. According to him, Dr. Santos's discontinuation of the Vicodin prescribed by his surgeon is deliberate indifference.

Specifically, Plaintiff argues that a prison doctor's disregard of an outside specialist's instructions is sufficient to survive a motion for summary judgment on a claim of deliberate indifference, citing *Gil v. Reed*, 381 F.3d 649, 661-64 (7th Cir. 2004). In *Gil*, the plaintiff was specifically instructed that he should "not take Tylenol III because of constipating effects" after surgery for rectal prolapse. *Id.* at 662. Nonetheless, a doctor at the penal institution discontinued the alternative, Vicodin, and instead prescribed

Tylenol III, in part because Vicodin was not "part of the Bureau of Prison's national formulary." *Id.* The plaintiff suffered from severe constipation, pain, bleeding, and the inability to urinate as a result of this switch. *Id.* The Seventh Circuit found that the failure to "provide the treatment ordered by the specialist" created a genuine issue of material fact on deliberate indifference that would preclude summary judgment. *Id.* The Court went on to say that the test for deliberate indifference is "a subjective one: the prison official must act or fail to act despite his knowledge of a substantial risk of serious harm." *Id.* at 664.

*Gil* is distinguishable. In that case, a specialist specifically instructed that certain medication should not be given to the inmate because of known adverse effects. In this case, Vicodin was listed as a "Medication" on Plaintiff's discharge summary from St. Mary's, but there is no notation that the medication was necessary for Plaintiff's recovery. Dr. Santos continued another medication, Tylenol, which was prescribed by the specialist, and discontinued Vicodin in lieu of an increased dose of Tylenol. There is no evidence that Vicodin could not be substituted for a higher dose of Tylenol. That is, there is no showing that "'the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment.'" *Sain v. Wood*, 512 F.3d 886, 895 (7th Cir. 2008) (quoting *Collignon v. Milwaukee County*, 163 F.3d 982, 988 (7th Cir. 1998)).

To support a claim of deliberate indifference, a prisoner is not required to show that he was "literally ignored." *Greeno v. Daley*, 414 F.3d 645, 653-654 (7th Cir. 2005).

Deliberate indifference can be shown where a plaintiff received "some treatment" but that the treatment was "'so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate' his condition." *Id.* (quoting *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996)). Thus, a jury could find deliberate indifference where a defendant's "obdurate refusal" to change a "course of treatment despite [ ] repeated reports that the medication was not working and [Plaintiff's] condition was getting worse" is shown. *Id.*

Plaintiff points out that he requested pain medication at 4:00 p.m. on January 12, 2011, and 8:00 a.m. the following day. These requests are not inconsistent with the medication ordered. On January 12, 2011, Plaintiff was prescribed 650 mg of Tylenol every six hours as needed; on January 13, 2011, he was prescribed up to 1000 mg of Tylenol every four hours as needed. That Plaintiff merely asked for pain medication is not evidence that his pain was not being relieved by the medication offered. Plaintiff also indicated in his deposition that "I don't think anyone would have had that type of pain with the right type of medication" during his recovery and that it was "just too much pain" (Harper Dep. p. 79). Plaintiff's speculation that he was not given the right type of medication is just that, speculation--there is no evidence that Vicodin would have been such a superior choice in pain management that the failure to prescribe it was deliberate indifference. Plaintiff even admitted that "as time went by, the pain became less as your body healed" (Harper Dep. p. 78). There is no evidence from which a jury could find that Dr. Santos ignored a substantial risk of harm.

In addition, Plaintiff argues that Dr. Santos failed to provide adequate nutrition

in the face of his starvation complaints. Plaintiff specifically complains that he was not given eggs exclusively, even though he told Dr. Santos that he could eat them without vomiting. The record reveals that after Plaintiff's surgery he looked thin and frail and he was having significant problems eating food without nausea and vomiting—not surprising in light of the type of surgery Plaintiff underwent. The evidence also reveals, however, that Plaintiff was cleared to eat regular food (and there is no question that he was given food to eat) by his surgeon. When Plaintiff informed the nursing staff and Dr. Santos that he was having trouble with the food provided, he was given various accommodations including protein drinks, meal replacement drinks, and additional food. That Plaintiff was not given specific food on request does not offend the Eighth Amendment. The Eighth Amendment does not entitle a prisoner to "demand specific care" nor does it entitle Plaintiff to the "best care possible." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). *See also Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996). The evidence reveals that Plaintiff was routinely given a regular diet, and his meals were supplemented in order to assure adequate nutrition.

Plaintiff finally argues that Dr. Santos has failed (and presumably is failing) to manage his kidney issue. In particular, Plaintiff argues that Dr. Santos failed to conduct ultrasounds every three months are required by his surgeon. As noted above, Plaintiff's surgeon advised an ultrasound every three months but indicated that Plaintiff would follow-up with his primary care doctor, "and he will decide about the renal mass." Thus, there was no directive that Plaintiff must receive an ultrasound, a specific type of evaluation, every three months. It is undisputed that Plaintiff was given an ultrasound

in April 2011 that was "suspicious" for "renal cell carcinoma." Since then, Plaintiff's kidney condition has been monitored with urine and blood tests. There is no showing that these tests are inappropriate or that they are a substantial departure from accepted professional practice. There is also no showing that an additional ultrasound would effectively "catch" issues that the urine and blood tests would not. Again, Plaintiff is not entitled to the treatment of his choice.

### b. *Nurse Terri Dean*

Plaintiff claims that Nurse Dean was deliberately indifferent by failing to treat him when he first presented to the HCU with stomach pain, by confiscating his pillow, by failing to empty his colostomy container, and by generally antagonizing Plaintiff during his recovery.

Plaintiff first argues (in his brief) that Nurse Dean turned Plaintiff away at least four times while he complained of intense pain. As noted above, Plaintiff's deposition indicates that he was turned away twice by the HCU.[3] The medical records reveal that he was turned away once, on December 3, 2010.[4] Regardless of the number of times he was "sent [ ] back to his cell to suffer," a jury could only find that he was treated for his complaints, just not in a manner than Plaintiff wanted (presumably immediate transfer for surgery). It is undisputed that when he appeared at the HCU for treatment, he was physically examined each time by a nurse (according to the records, Nurse Pedergois on December 3, 2010, Nurses Kracht, Wesselmann, Shuker, and Maloy on December 4,

---

[3] While this Court must accept all facts in a light most favorable to Plaintiff, it is not required to accept all of Plaintiff's arguments that misconstrue the evidence.
[4] Of course, Nurse Dean denies that she saw or examined Plaintiff on December 3 through December 5, 2010.

2010, and Nurse Baggett on December 5, 2010) and given a treatment plan. That Nurse Dean did not examine him or admit him, or even that she laughed at him, may show that she was not compassionate; however, in light of the treatment that Plaintiff did receive, is not an indication that she was deliberately indifferent.[5]

An inference to be drawn from Plaintiff's deposition is that Nurse Dean somehow managed the other nurses and made the ultimate decision to send Plaintiff back to his cell without any effective treatment. But there is no evidence of such a supposition. Specifically, there is no evidence that Nurse Dean was a managing nurse or in any position of authority such that she could dictate the actions of other nurses. There is likewise no showing that she could overrule or bypass the decisions of other nurses. Based on the evidence before the Court, no jury would find deliberate indifference regarding Plaintiff's care prior to surgery.

Plaintiff also complains that Nurse Dean aggravated him by confiscating a pillow, failing to empty his colostomy container upon request, and otherwise mocking his inability to walk.[6] Thus, Plaintiff argues, "Dean actively sought to divest him of the most basic comforts." As noted above, that Nurse Dean may not have been a compassionate nurse is not the touchstone of a deliberate indifference claim. These claims require no further comment.

---

[5] To the extent that Plaintiff argues that either Nurse Dean or Dr. Santos were deliberately indifferent because they did not effectively manage their staff, such a claim in non-cognizable because there is no *respondeat superior* liability in § 1983 actions. *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014).

[6] In his brief, Plaintiff does not argue that Nurse Dean was deliberately indifferent in the treatment of his DVT/blood clot related to the I.V. The evidence reveals that Nurse Dean treated Plaintiff by cleaning and re-attaching the I.V., when it started bleeding. There is no competent evidence that she was responsible for the blood clot or that she failed to appropriately care for the I.V. site.

## CONCLUSION

For the reasons set forth above, the Motion for Summary Judgment filed by Defendants Venerio M. Santos and Terri Dean (Doc. 40) is **GRANTED**, and this action is **DISMISSED** with prejudice. The Clerk of Court is **DIRECTED** to enter judgment in favor of Defendants and against Plaintiff.

**IT IS SO ORDERED.**

**DATED: March 30, 2015**

s/ Nancy J. Rosenstengel_____
**NANCY J. ROSENSTENGEL
United States District Judge**
